# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BERNADETTE LIONETTA and CHERYL WALLACE, individually and on behalf of all others similarly situated, <br><br>          Plaintiffs, <br><br>    v. <br><br> INMARKET MEDIA, LLC, <br><br>          Defendant. | Case No. 1:24-cv-11170-JEK <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Bernadette Lionetta and Cheryl Wallace ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action complaint against defendant InMarket Media, LLC ("InMarket" or "Defendant"). Plaintiffs make their allegations upon personal knowledge as to facts pertaining to themselves, and on information and belief as to other matters.

## <u>NATURE OF THE ACTION</u>

1. InMarket is a data aggregator company and digital marketing platform.

2. It collected, stored, shared, and/or used Plaintiffs and other class members' sensitive personal information—including historical and real-time geolocation data ("Personal Information")—without their informed consent.

3. InMarket accomplished this through inMarket-owned and operated applications and through the InMarket Software Development Kit ("SDK") that is embedded into many third-party applications.

4. For most of its life, InMarket's business grew through its appeal to mobile application developers, brands, and retailers.

5.      For mobile applications, InMarket's SDK made targeted audiences available to advertisers, drawing greater ad revenue and better returns on investment. And the incorporation of the InMarket SDK into third-party applications ("apps") allowed InMarket to expand its historic and real-time location database.

6.      For brands, InMarket offered access to or use of its vast historic and real-time location data to better target ads and reach desired audiences.

7.      For retailers, InMarket offered targeted advertising of store items based on a consumer's precise location data, which could be as granular as the store aisle they were browsing. This allowed retailers to highlight items based on a consumer's location, trajectory, and potential intent.

8.      Since 2018, InMarket has prioritized the expansion of its consumer reach and location database, both through acquisitions of mobile apps and by persuading third-party apps to embed InMarket's spyware SDK into their platforms. While pursuing this grand expansion of its database, InMarket failed to take necessary measures to ensure that third-party apps incorporating its SDK made the appropriate disclosures and obtained informed consent from consumers regarding InMarket's use of their data.

9.      As a result of Defendant's conduct, Plaintiffs' and class members' privacy has been invaded, and their Personal Information has been collected, stored, shared, used, and/or monetized without their consent.

## **PARTIES**

10.     **Plaintiff Bernadette Lionetta** is an adult citizen of the state of Massachusetts and resides in Charleston, Massachusetts.

11.     Ms. Lionetta downloaded and used third-party mobile applications containing an InMarket SDK embedded in its platform. The InMarket SDK collected and transmitted Plaintiff's Personal Information, including geolocation data, to InMarket.

12.     **Plaintiff Cheryl Wallace** is an adult citizen of the state of Massachusetts and resides in Sudbury, Massachusetts.

13.     Ms. Wallace downloaded and used third-party mobile applications containing an InMarket SDK embedded in its platform. The InMarket SDK collected and transmitted Plaintiff's Personal Information, including geolocation data, to InMarket.

14.     Plaintiffs had no knowledge of, and never consented to, the collection, storage, use, and/or sharing of their data by InMarket or any other third party.

15.     **Defendant InMarket Media, LLC** is a Delaware corporation with its principal place of business at 111 Congress Avenue, Suite 500, Austin, Texas 78701. InMarket transacts or has transacted business in this District and throughout the United States.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member (including both named plaintiffs) is a citizen of a state different from Defendant.

17.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

18.     This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here. Plaintiffs are domiciled and suffered their primary injury in this district.

19.     InMarket has been registered with the Massachusetts Secretary of State since at least September 6, 2022, and has designated an agent for service of process in Boston, Massachusetts. Accordingly, InMarket has consented to jurisdiction in this state.

20.     As part of its ordinary business practice, InMarket surreptitiously monitors and tracks the activities of Massachusetts consumers in real-time, including tracking their location for marketing purposes. This information includes device identifier information and geolocation information. InMarket then purposely adds this information from Massachusetts consumers to its database for sale to third parties.

21.     For the last ten years, Massachusetts consistently has ranked as one of the most prosperous states in the United States, including during the height of the COVID-19 pandemic. Companies have a correspondingly high interest in marketing to Massachusetts consumers, which in turn increases the value of data about those consumers. As a result, InMarket has derived substantial revenue from the surreptitious collection and sale of data about Massachusetts consumers.

22.     InMarket knowingly obtains data regarding Massachusetts consumers.

23.     As a result of its geolocation tracking, InMarket intentionally identifies Massachusetts consumers, compiles data about Massachusetts consumers, and sells data about Massachusetts consumers.

24.     InMarket's tracking and sale of Massachusetts consumer data is repeated and intentional; it is not random, fortuitous, or attenuated.

## FACTUAL ALLEGATIONS

**A.**    **InMarket Collects and Monetizes Historic and Real-Time
Location Data Aggregated from Mobile Applications**

25.    InMarket is a digital marketing platform and data aggregator. It collects consumer

location data through applications InMarket owns and its SDK which is incorporated into third-

party mobile applications.

26.    InMarket obtains large swaths of personal data on consumers—including

information about their movements over time gathered from their mobile devices, as well as their

purchasing history, demographic data, and socioeconomic backgrounds.

27.    It keeps that information for up to five years.

28.    InMarket uses the consumer data to facilitate targeted advertising to consumers on

their mobile devices for the company's clients, which include brands and advertising agencies.

29.    InMarket displays this advertising itself using the InMarket SDK, and also

categorizes consumers into groups called "advertising audiences" that enable its clients to target

consumers more precisely on third-party advertising platforms.

30.    Defendant fails to notify consumers that their location data will be used for targeted

advertising and fails to verify that apps incorporating the InMarket SDK have notified consumers

of such use.

31.    InMarket's SDK is a collection of development tools that can be incorporated into

mobile applications to obtain the historic and real-time location of the applications' users.

32.    Defendant has incorporated the InMarket SDK into the mobile applications that it

owns and operates (the "InMarket Apps"). InMarket Apps consist of applications InMarket created

soon after the company's formation and the mobile applications it acquired as part of a campaign

to expand its reach and location database. The former applications include CheckPoints, which

offers shopping rewards for completing tasks such as watching videos and taking online quizzes,

and ListEase, which helps consumers create shopping lists. These applications have been downloaded onto over 30 million unique devices since 2017.

33.     Since 2010, InMarket has offered the CheckPoints app on both the iOS and Android platforms. InMarket's CheckPoints app is marketed as a "rewards app," and promises users "easy money—earn as you shop." It tells consumers to "join the millions earning free gift cards and more every day." Users of the app collect points by performing various tasks (checking into retail locations, watching videos, scanning certain products while in store, taking surveys and quizzes), and then exchange those points for rewards, such as gift cards. The app is free to download and includes in-app advertising.

34.     Since 2012, InMarket has offered the ListEase app on both the iOS and Android platforms. The ListEase app markets itself as an electronic shopping list app. The app is free to download and includes in-app advertising.

35.     The consent screens used for both the CheckPoints and ListEase apps tell consumers that their location will be used for the app's functionality (earning points and keeping lists), which are misleading half-truths. Thus, users are choosing to share their location with these apps for specific purposes completely unrelated to InMarket's larger advertising-related business.

36.     At no point during the consent process for either the CheckPoints or ListEase Apps did InMarket also disclose that it was collecting users' precise location, often multiple times per hour, along with data collected from multiple other sources—including through other apps using the InMarket SDK—to build extensive profiles on users to be used to precisely target them with advertising.

37.     Although InMarket discloses in its privacy policy that it uses consumer data for targeted advertising, its consent screen does not link to the privacy policy language, and the misleading prompts do not inform consumers of the apps' data collection and use practices.

38.     Representations related to use of consumers' location information for advertising and tracking are material to consumers.

39.     In 2019, InMarket launched a campaign of mobile application acquisitions to expand its consumer reach and location database. To that end, in August 2019, InMarket announced the acquisition of Thinknear, a location-based mobile marketing platform. InMarket's press release on the acquisition described the benefit of the partnership as follows:

> The acquisition will allow Thinknear's clients to engage at the moment of truth through InMarket's 50 million Comscore-verified smartphone integrations. These direct connections enable brands to identify and engage consumers during multiple touchpoints of the purchase journey, including as they walk into any location in the US. InMarket's Moments technology delivers real-time, premium engagements with customers at precise locations during consideration and decision. InMarket clients will gain access to Thinknear's place-based targeting and Geotype technology, which create valuable high-performing profiles around ideal customers based on location behavior. Thinknear's Geolink is an advanced self-serve dashboard that will give InMarket clients one of their most requested features-- the hands-on ability to launch campaigns themselves from trading desks.[1]

40.     In September 2020, InMarket announced the acquisition of assets from NinthDecimal, another location-based attribution and analytics company. The press release noted that "[m]arketers will now have access to an omnichannel platform that includes location and transactional audiences; GeoLink self-service marketing with real-time Moments; Location Conversion Index (LCI) attribution; and a robust set of advanced analytics -- all via one partner."[2]

41.     In December 2020, InMarket completed the acquisition of Key Ring, the shopper loyalty app from Vericast.

42.     InMarket advertised the acquisition as a further step to "empower brands to reach highly engaged, opted-in shoppers in real-time, while closing the loop on measuring campaign

---

[1] https://www.prnewswire.com/news-releases/inmarket-to-acquire-thinknear-expand-location-based-marketing-solutions-300899051.html (last accessed Feb 5, 2024).

[2] https://www.prnewswire.com/news-releases/inmarket-acquires-assets-from-ninthdecimal-creating-the-definitive-leader-in-real-time-data-driven-marketing-301126032.html (last accessed Feb 5, 2024)

effectiveness," as well as "underscore[] the growing importance of first party data from opted-in consumers, and the value of real-time contextual advertising."[3]

43.     In June 2021, InMarket acquired Out of Milk, a shopping list app with millions of downloads. InMarket announced this acquisition as a move to "further bolster its industry-leading suite of owned-and-operated apps, including List Ease, CheckPoints, and Key Ring that span the journey as shoppers plan, save and organize. These unique properties are part of InMarket's competitive advantage reaching shoppers across all stores and categories. The apps empower brands to reach a variety of highly engaged, opted-in shoppers in real-time."[4] Todd Dipaola, CEO and Founder of InMarket, highlighted the key function of this and the preceding acquisitions: to "scale InMarket" and its breadth of location data.

44.     Defendant also makes the InMarket SDK available to third-party app developers, and it has been incorporated into more than 300 such apps, which have been installed on over 390 million unique devices since 2017. App developers are incentivized to incorporate the InMarket SDK into their app because they receive a portion of InMarket's advertising revenue from each ad served through their apps.

45.     One of the primary functions of the InMarket SDK is to transmit a consumer's precise location back to Defendant.

46.     Apps that incorporate the InMarket SDK request access to the location data generated by a mobile device's operating system. If the user allows access, the InMarket SDK receives the device's precise latitude and longitude, along with a timestamp and a unique mobile

---

[3] https://www.prnewswire.com/news-releases/inmarket-acquires-key-ring-expanding-its-data-driven-marketing-and-insights-suite-301190647.html (last accessed Feb 5, 2024)

[4] https://www.prnewswire.com/news-releases/inmarket-acquires-out-of-milk-to-bolster-real-time-contextual-advertising-from-planning-to-purchase-301317186.html (last accessed Feb 5, 2024)

device identifier, as often as the mobile device's operating system provides it—ranging from almost no collection when the device is idle, to every few seconds when the device is actively moving—and transmits it directly to Defendant's servers.

47.     From 2016 to the present, about 100 million unique devices sent Defendant location data *each year*.

48.     In addition to not disclosing its data collection practices in its proprietary apps, InMarket also does little to verify that third-party apps incorporating its SDK obtain informed consumer consent before granting InMarket access to their sensitive location data. InMarket additionally neither collects nor retains records of the disclosures that third-party apps incorporating the InMarket SDK provide consumers before accessing their location data.

49.     In fact, InMarket does not require the third-party apps that incorporate its SDK to obtain informed consumer consent. Aside from general guidelines requiring the app developers to "comply with all applicable laws," and to maintain a "privacy policy in line with legal requirements," InMarket's contract with the developers requires nothing more from them in terms of privacy.

50.     Even if these third-party app developers wanted to provide adequate disclosure to their users about InMarket's use of their location data, InMarket does not provide the developers with sufficient information to provide that notice. Specifically, InMarket's contract with third-party app developers merely states that InMarket will serve ads on the developer's apps in return for developers passing user information to InMarket, including precise location and advertising identifiers.

51.     InMarket does not disclose that information collected from these third-party users will be supplemented and cross-referenced with purchased data and analyzed to draw inferences about those users for marketing purposes.

52.     InMarket therefore does not know whether users of hundreds of third-party apps that incorporate the InMarket SDK were informed that their data would be collected and used for targeted advertising or consented to such collection and use of their location data. In fact, the third-party apps' disclosures are, in some cases, misleading—for instance, leading a consumer to believe that their location data will be used for one purpose (such as obtaining discounts at certain retailers), when in fact the location data is being used by InMarket as alleged herein.

53.     Because InMarket readily combined the location data of users into its databases and systems without confirming user consent, InMarket obtained and used that data without informed user consent, resulting in consumer injury.

**B.      InMarket Creates Specific Audience Segments for Targeted Advertising Based on Sensitive Location Data**

54.     Through the InMarket SDK, Defendant collects sensitive information from consumers, including where they live, where they work, where they worship, where their children go to school or obtain child care, where they receive medical treatment (potentially revealing the existence of medical conditions), where they go to rallies, demonstrations, or protests (potentially revealing their political affiliations), and any other information that can be gleaned from tracking a person's day-to-day movements. All of the above information is collected along with several identifiers including a unique mobile device identifier.

55.     Defendant processes the location data it collects so that it can determine how long a particular mobile device (and therefore a particular consumer) stays at a given location. All data collected through the SDK is processed together, meaning that InMarket may use data from multiple apps to determine when a particular consumer arrived at a particular location, how long they stayed there, and when they left.

56.     InMarket cross-references consumers' location histories with advertising-related points of interest to identify consumers who have visited those locations.

57.     InMarket sorts consumers, based on their visits to points of interest, into audience segments to which advertising can be targeted.

58.     InMarket has created or maintains almost 2,000 distinct advertising audience segments. For example, an InMarket brand client can target shoppers who are likely to be low-income millennials; well-off suburban moms; parents of preschoolers, high-school students, or kids who are home-schooled; Christian church goers; convenience-sensitive or price-sensitive; single parents or empty-nesters; affluent or blue collar workers; "healthy and wealthy" or "wealthy and not healthy," to name only a selection of the categories InMarket offers or has offered to its brand clients.

59.     InMarket classifies audiences based on both past behavior and predictions it makes about consumers based on that behavior. For example, if a consumer's past location data shows that they have visited a car dealership, InMarket can combine that information with the consumer's attributes purchased from other sources (age, income, family structure, education level), and can potentially predict that they may be in the market for a certain type of vehicle.

60.     The InMarket SDK displays the ads and determines which ads appear in which apps incorporating the SDK. InMarket additionally offers advertisers a product that sends push notifications based on a consumer's location and "geofencing" (i.e., a virtual fence around a particular point of interest). When the InMarket SDK transmits a location that is inside a virtual fence, the app will send a push notification for a particular ad. For example, a consumer who is within 200 meters of a pharmacy might see an ad for toothpaste, cold medicine, or some other product sold at that location.

61.     InMarket also makes its advertising audience segments available on real-time bidding platforms. An advertiser using one of these platforms can select an advertising audience and identify the amount that it is willing to pay (that is, its bid) each time its ad appears on a mobile

device that is a part of that audience. The advertiser's ad will appear on a particular device if it has the highest bid for that device. InMarket receives some revenue each time an advertiser uses one of its audiences in this process.

62.     Before an app can access a mobile device's location data, the mobile device user must grant access in a system prompt generated by the device's operating system. Despite collecting vast amounts of consumer location and other data for consumer advertising and targeting purposes, InMarket does not fully disclose such collection and use in the system prompts seeking a user's consent to location collection or in-app screens that precede the prompt. InMarket fails to obtain informed consent in the apps it owns and operates, and also fails to verify that the third-party apps which incorporate InMarket's SDK obtain informed consumer consent.

### C.     InMarket Creates Specific Audience Segments for Targeted Advertising Based on Sensitive Location Data.

63.     After collecting sensitive precise location data about consumers' daily movements, InMarket retains that information longer than reasonably necessary to accomplish the purpose for which that information was collected and thereby exposes consumers to significant unnecessary risk. Specifically, InMarket has retained consumer location data for five years prior to deletion.

64.     This unreasonably long retention period—far longer than is necessary to accomplish InMarket's stated purpose for collection (to allow a consumer to earn shopping points or make shopping lists)—significantly increases the risk that this sensitive data could be disclosed, misused, and linked back to the consumer, thereby exposing sensitive information about that consumer's life.

65.     InMarket's comprehensive collection and long-term retention of location data subject consumers to a likelihood of substantial injury through the exposure of their re-identified location.

66.     InMarket touts its commitment to data privacy, claiming on a page on their website titled "Ethics Principles" that "InMarket is committed to serving its clients in a responsible way that 'does no harm.' We provide transparency about our data practices and respect the choices individuals make about their personal data."[5]

67.     InMarket listed, as part of their "Ethics Principles" that they "do not target vulnerable communities with harmful messages" and "do not use sensitive location visit data in our products. (For example, we suppress and delete data from sexual and reproductive healthcare providers.)"

68.     In 2019, the CEO of InMarket, Todd DiPaola stated the focus of the company in following words: "The InMarket platform is built with accuracy and actionability as its core focus. Whether it's delivering growth for our brand partners or closing the loop on sales at real-world businesses, accuracy is absolutely critical."[6]

69.     InMarket utilized strategic acquisitions to enhance its consumer reach and grow its sensitive location database.

70.     In an interview published on Martech Cube on June 20, 2023, Michael Della Penna, the Chief Strategy Officer of InMarket, emphasized the role acquisitions has played in InMarket's expansion of its consumer database. "Our acquisitions over the last few years have enhanced out capabilities and platforms for consumers, brands, and marketers. This strategy has included the expansion of our owned and operated apps including the acquisition of shopping apps that enable consumers to plan, save and organize around their shopping trips. The acquisition of consumer apps Out of Milk, a consumer list and shopping app, and KeyRing, a leading loyalty app,

---

[5] InMarket, *Ethics Principles*, https://inmarket.com/ethics-principles/ (last visited Feb. 5, 2024)

[6] https://www.prnewswire.com/news-releases/the-path-to-purchase-institute-adds-inmarket-loyalty-data-to-its-retailer-profiles-300870631.html (last visited Feb. 5, 2024)

specifically enhanced our consumer app offerings, including List Ease and Checkpoints, which were launched in the early days of InMarket. Subsequent acquisitions including ThinkNear and NinthDecimal further enhanced our close-loop marketing offerings by providing us with a DSP platform Geolink, a proprietary audience offering, GeoTypes which combines various attributes to better understand what motivates consumers or why they shop, and an omnichannel attribution platform to better understand key KPI like visitation and purchase lift associated with a consumer seeing an add."[7]

71.     Despite these assurances and claims, InMarket made expansion of its location database through its SDK on third-party apps a central component of its business model.

72.     As a result of the events detailed herein, Plaintiffs and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from Defendant's unlawful data collection practices, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information; loss of value and loss of possession and privacy of Personal Information; and other harm resulting from the unauthorized access to Personal Information.

73.     As a result of Defendant's unlawful data collection practices, Plaintiffs' and Class members' privacy has been invaded and their Personal Information is now accessible to unauthorized third parties that may utilize this information to Plaintiffs' and Class members' detriment.

## CLASS ALLEGATIONS

74.     Plaintiffs bring this action on behalf of themselves and the following class pursuant to Federal Rule of Civil Procedure 23 (the "Class"):

---

[7] https://www.martechcube.com/martech-interview-with-michael-della-penna-cso-of-inmarket/ (last visited Feb. 5, 2024)

> All residents of Massachusetts whose Personal Information was collected
> by Defendant without their informed consent.

75.    Excluded from the Class are Defendant and its affiliates, officers, directors, assigns, successors, and the Judge(s) assigned to this case.

76.    **Numerosity**: While the precise number of Class members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to potentially include hundreds of thousands of members who are geographically dispersed.

77.    **Typicality**: Plaintiffs' claims are typical of Class members' claims. Plaintiffs and all Class members were injured through Defendant's uniform misconduct, and Plaintiffs' claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiffs' claims are typical of Class members' claims.

78.    **Adequacy**: Plaintiffs' interests are aligned with the Class they seek to represent, and Plaintiffs have retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged data privacy violations. Plaintiffs and undersigned counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

79.    **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and other Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendant's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation

increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

80.     **Commonality and Predominance**: The following questions common to all Class members predominate over any potential questions affecting individual Class members:

a.      whether Defendant engaged in the wrongful conduct alleged herein;

b.      whether Defendant's collection, storage, distribution, and/or use of Plaintiffs' and Class members' Personal Information violated privacy rights and invaded Plaintiffs' and Class members' privacy; and

c.      whether Plaintiffs and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

81.     Given that Defendant engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

### FTC'S ACTION AGAINST DEFENDANT

82.     In January 2024, the FTC announced a proposed settlement with Defendant for the type of conduct underlying this complaint.[8]

83.     According to the FTC's proposed complaint, Defendant's "Unfair Collection and Use of Consumer Location Data," "Unfair Collection and Use of Consumer Location Data from Third Party Apps," "Unfair Retention of Consumer Location Data," and "Deceptive Failure to Disclose InMarket's Use of Consumer Location Data," as described above, constitutes a violation

---

[8] https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-order-will-ban-inmarket-selling-precise-consumer-location-data

of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."[9]

84.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**CAUSES OF ACTION**

**COUNT I**

**Unjust Enrichment**

85.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

86.     Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant.

87.     Plaintiffs and Class members unwittingly conferred a benefit upon Defendant. Defendant acquired valuable personal location information belonging to Plaintiffs and Class members which it then sold to other parties without the consent of Plaintiffs and Class members. Plaintiffs and Class members received nothing from this transaction.

88.     Defendant has knowledge of such benefits.

89.     Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiffs' and Class members' data, including their geolocation data. Retention of those moneys under these circumstances is unjust and inequitable because Defendant did not obtain the consent of Plaintiffs and Class members before selling their data to third parties as described above.

---

[9] https://www.ftc.gov/system/files/ftc_gov/pdf/Complaint-InMarketMediaLLC.pdf

90.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court.

91.     Plaintiffs have no adequate remedy at law for this claim.  Plaintiffs plead their claim for unjust enrichment in the alternative, which inherently would necessitate a finding of no adequate remedy at law.  Alternatively, legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937).   Furthermore:

a.     To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.

b.     Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiffs to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiffs seek such relief here.

c.     Legal claims for damages are not equally certain as restitution because claims under unjust enrichment entail few elements.

d.     A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." Restatement (Third) of Restitution, § 4(2).

## COUNT II

**Violation of the Massachusetts Unfair and Deceptive Business Practices Act,
Mass. Gen. Laws Ch. 93A *et seq.***

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

93.     Plaintiffs bring this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

94.     Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("93A")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."

95.     It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

96.     An act or practice is a violation of 93A if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2." 940 CMR 3.16.

97.     Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons."

19

98.     Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by engaging in the purchase and sale of Products that directly or indirectly affect the people of Massachusetts.

99.     By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

100.    Defendant's misrepresentations deceive and have a tendency to deceive a reasonable consumer and the general public.

101.    Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and omissions described above and would be induced to act on the information in deciding to use services such as phone applications.

102.    Defendant has also committed a violation of 93A predicated on its violations of FTC regulations – specifically, its violation of Section 5 of the FTC Act as interpreted by the Federal Trade Commission.

103.    Plaintiffs and members of the Massachusetts Subclass were deceived by Defendant's policies and in fact had no idea that Defendant was selling their location data.

104.    Plaintiffs and members of the Massachusetts Subclass did not consent to Defendant's sale of their location data.

105.    Defendant in conjunction with third party phone and internet applications knowingly omitted that Defendant had access to and was selling the location data of Plaintiffs and the class.

106.    Had Plaintiffs and Massachusetts Subclass members known that the Defendant was selling their data, they would either have ceased to use the relevant phone applications or would have requested compensation for the misappropriation and sale of their location data.

107.    Plaintiffs and Massachusetts Subclass Members were injured as a direct and proximate result of Defendant's breach because Defendant misappropriated and sold the location data of Plaintiffs and Massachusetts Subclass members without consent.

108.    Plaintiffs and members of the Massachusetts Subclass have been harmed by this injury, adverse consequence, and/or loss.

109.    93A represents a fundamental public policy of the Commonwealth of Massachusetts.

110.    For each loss, Plaintiffs and each member of the Massachusetts Subclass may recover an award of actual damages or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

111.    Disgorgement of profit derived from an unfair and deceptive act or practice is a permissible damage remedy under G.L. c. 93A, § 9.

112.    Accordingly, Plaintiffs and the members of the Massachusetts Subclass seek the disgorgement of profits that Defendant derived from the sale of their location data.

113.    Because Defendant acted willfully or knowingly, Plaintiffs and each member of the Massachusetts Subclass may recover up to three but not less than two times this amount. In addition, Plaintiffs may recover attorneys' fees and costs.

114.    Plaintiffs and each member of the Massachusetts Subclass may recover an award of actual damages (in this case unlawful profit derived from the sale and trading of location data) or twenty-five dollars, whichever is greater. Ch. 93A § 9(3).

115.    Plaintiffs and the members of the Massachusetts Subclass may also seek the imposition of an injunction relief which limits and polices Defendant's representations within or reaching Massachusetts. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiffs, members of the Massachusetts Subclass, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiffs,

members of the Massachusetts Subclass, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

116.     In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), on May 2, 2024 Plaintiffs' counsel served Defendant with written notice of its violation of Ch. 93A and a demand for relief. A true and correct copy of the letter is attached hereto as **Exhibit 1**. Defendant did not make a written tender of settlement for the putative class.

<u>**RELIEF DEMANDED**</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class members;

b.     For an order declaring that Defendant's conduct violates the laws referenced herein;

c.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

g.     For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 7, 2024                                  Respectfully submitted,

By: */s/ James J. Reardon, Jr.*
      James J. Reardon, Jr.

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO #566161)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**AHDOOT & WOLFSON, PC**
Tina Wolfson (*pro hac vice* forthcoming)
*twolfson@ahdootwolfson.com*
Robert Ahdoot (*pro hac vice* forthcoming)
*rahdoot@ahdootwolfson.com*
Theodore Maya (*pro hac vice* forthcoming)
*tmaya@ahdootwolfson.com*
Deborah De Villa (*pro hac vice* forthcoming)
*ddevilla@ahdootwolfson.com*
Sarper Unal (*pro hac vice* forthcoming)
*sunal@ahdootwolfson.com*
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel: 310.474.9111
Fax: 310.474.8585

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
jmarchese@bursor.com
jdiamond@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice* forthcoming)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455

Fax: (925) 407-2700
ltfisher@bursor.com

*Attorneys for Plaintiffs and the Proposed Class*

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 7, 2024, a true and correct copy of the forgoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: October 7, 2024                          /s/ James J. Reardon, Jr.
                                                James J. Reardon, Jr.